**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**PHYLLIS R. PITTS,**

    **Claimant,**

**v.**             **Case No. 3:09-cv-01110**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

    **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

   This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 401-433. This case was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The case is presently pending before the Court on the parties' cross-motions for judgment on the pleadings. (Docket Nos. 14 and 15).

**I. Procedural History**

   Claimant, Phyllis R. Pitts (hereinafter referred to as "Claimant"), filed her first application for a period of disability and DIB on July 9, 2001. (Tr. at 15). She alleged a disability onset date of January 31, 2001 due to carpal tunnel syndrome, epicondyle tendinitis, diabetes mellitus, depression, arteriosclerosis, and hypertension. (Tr. at 33). This application was denied initially and upon reconsideration. (Tr. at 15). Upon review

by an Administrative Law Judge, the Honorable Barry Anderson, a decision of non-disability was made, which was ultimately upheld by the United States District Court for the Southern District of West Virginia on August 12, 2004. *Id.*

Prior to the final adjudication of the first application, Claimant filed a second application on July 10, 2003, alleging a disability onset date of December 31, 1999.[1] (Tr. at 15).   Claimant contended that her disability was due to high blood pressure; epicondilytal tendonitis-bilateral; carpal tunnel syndrome-bilateral; angina; depression; ruptured disc-back; diabetes; and "heart." (Tr. at 90).  The claim was denied initially on November 5, 2003 and upon reconsideration on January 5, 2004. (Tr. at 15). The Claimant then requested a hearing before an Administrative Law Judge. (*Id*). A video hearing pursuant to 20 C.F.R. § 404.936(c) was held on January 25, 2006 before the Honorable David S. Antrobus (hereinafter the "ALJ"). (Tr. at 15). By decision dated February 9, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 15-25).  The ALJ's decision became the final decision of the Commissioner on August 12, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 6-8). Claimant timely filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).  (Docket No. 2).

Under 42 U.S.C. § 423(d)(5), a claimant for disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months" 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability

---

[1] Claimant later amended her disability onset date to March 1, 2003, because the prior adjudication was *res judicata* for the time period prior to and including  ALJ Anderson's decision dated February 28, 2003.

claims. 20 C.F.R. § 416.920 (2008). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* at § 416.920(a).

The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* at § 416.920(b). If the claimant is not engaged in substantial gainful employment, the second inquiry is whether claimant suffers from a severe impairment. *Id.* at § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* at § 416.920(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* at § 416.920(e).

By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education, and prior work experience. 20 C.F.R. § 416.920(f). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms,

and laboratory results to determine whether the claimant has a medically determinable mental impairment.  If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c).  That section provides as follows:

> c) *Rating the degree of functional limitation.*
>
> (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> 3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation.  A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and

concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities.   20 C.F.R. § 404.1520a(d)(1).   Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder.   20 C.F.R. § 404.1520a(d)(2).   Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function.   20 C.F.R. § 404.1520a(d)(3).   The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusion based on the technique. The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).   The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(2).

In this case, the ALJ determined that claimant satisfied the first step of the process, because she had not engaged in gainful activity since the date of the alleged onset of disability. (Tr. at 18, Finding No. 2).  Likewise, the claimant was deemed to pass the second step with severe impairments of bilateral carpal tunnel syndrome with residual pain and weakness subsequent to surgery, diabetes mellitus, obesity, and

cervical and lumbosacral strain with a history of prolapsed L5-S1 disc. (Tr. at 18, Finding No. 3).  At the third step in the evaluation, the ALJ found that the Claimant's impairments did not meet or equal the level of severity of any impairments listed in Appendix 1. (Tr. at 19, Finding No. 4).  The ALJ concluded from the evidence that the Claimant had a residual functional capacity to perform light work not entailing repetitive use of the hands, with the following exertional and non-exertional limitations:

> Ms. Pitts has the residual functional capacity to sit up to six hours in an eight-hour workday, stand and walk up to six hours in an eight-hour workday, and lift weights of up to ten pounds frequently and twenty pounds occasionally. Nonexertionally, due to residuals of her carpal tunnel syndrome and related surgery, she cannot use her upper extremities for repetitve movements or fingering.  Her pain is mild to moderate and does not interfere with her ability to perform the sustained physical and mental demands of work activity.

*Id.*

At step four, the ALJ found that the claimant was unable to perform any past relevant work.  (Tr. at 23, Finding No 6).  At step five, he noted that Claimant was 55 years old on the alleged disability onset date, and, therefore, was defined as a person of "advanced age," but she had customer service skills that were "transferable to other customer service-type work." (Tr. at 23, Findings 7 and 9).  Based upon the testimony of the vocational expert, the ALJ concluded that the claimant had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy; therefore, she was not under a disability as defined in the Social Security Act.  (Tr. at 24-25, Finding No. 11).

## II.  Scope of Review

The sole issue before the Court is whether the final decision of the Commissioner is supported by substantial evidence.  In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

[E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001).

A careful review of the record reveals that the final decision of the Commissioner is not supported by substantial evidence for the reasons set forth below.

## III.   Claimant's Background

Claimant was born in 1947 and was 58 years old at the time of the administrative hearing. (Tr. at 311-312). She was a high school graduate with one year of college education and worked for fifteen years as a customer service consultant in the collections department of a public utility company. (Tr. at 91, 313). Claimant explained her job duties as follows: I "talked with the customers whose services were either getting ready to go off or had already been disconnected, restored their services, and I took notes, accepted their payments over the phone, and that type of thing. I typed. . . all day." (Tr. at 313). Claimant spoke and read English. (Tr. at 89).

## IV.    Medical Records

The Court has reviewed the Transcript of Proceedings held before the ALJ in its entirety.   (Docket No. 9).   To the extent that medical documents are germane to the Court's analysis of the issues in dispute, they are discussed below.

### A.    Relevant Medical Evidence Prior to March 1, 2003

The record contains a substantial number of medical documents that pre-date the alleged onset of Claimant's disability; that being March 1, 2003.  The Court has reviewed all of the medical evidence, but will only consider and comment on the historical records that elucidate Claimant's medical condition at the time of her application for DIB.

In February and March of 1993, Claimant underwent surgery performed by Dr. James Nappi, a hand and microsurgery specialist, to relieve symptoms associated with bilateral carpal tunnel syndrome.   (Tr. at 225-239).   Carpal tunnel syndrome is a painful, progressive condition caused by compression of the median nerve in the wrist.[2] In the years that followed, Claimant also developed flare-ups of lateral epicondylitis, which required injections in both elbows.   (*Id).*   Lateral epicondylitis, also known as tennis elbow, is a painful condition that occurs when tendons in the elbows are overworked, usually by repetitive motions of the wrists and arms.[3] Despite the surgery and injections, Claimant continued to experience pain in her elbows and wrists; particularly when typing.  According to Claimant, as a result of continued pain, she wore wrist splints when she typed at work. (Tr. at 290).   Early in 2001, she was placed on typing restrictions by her primary care physician and, eventually, stopped typing altogether. (Tr. at 139).

---

[2]  National Institutes of Health, National Institute of Neurological Disorders and Stroke; www.ninds.nih December 18, 2009.
[3] MayoClinic.com  October 21, 2010.

According to the evidence in the record, Claimant began regular treatment with Dr. Lynn Goebel, her primary care physician, around April 14, 1995.   (Tr. at 290).   At that time, Claimant complained of carpel tunnel syndrome, hypertension, chest tightness related to stress, skin lesions, and status post hysterectomy.  (Tr. at 290-291). Later that year, Dr. Goebel added hyperlipidemia and chronic back pain related to a prolapsed intervertebral disk at L5-S1 to the list of Claimant's chronic medical conditions.  (Tr. at 285).   In 1996, Claimant was diagnosed with diabetes mellitus and sciatica related to her disk, as well as obesity. (Tr. at 280-284).   In October 1997, Dr. Goebel began treating Claimant for depression and, in 1998, for anxiety disorder, as well. (Tr. at 276-277).   Claimant continued to have trouble with all of these chronic conditions over the next five years, with her complaints and symptoms waxing and waning at various times.   (Tr. at 181-198, 260-294).   Dr. Goebel monitored Claimant closely, seeing her about every three months.

In January 2001, Claimant was admitted to Cabell Huntington Hospital by Dr. Elie Gharib, of University Cardiovascular Services, for chest pain of four years duration that was occurring more frequently and with less activity.  (Tr. at 304-306).   Dr. Gharib commented that Claimant's past medical history was significant for hypertension; diabetes mellitus, Type II; obesity; carpal tunnel syndrome; anxiety disorder; seasonal allergies; and status post abdominal hysterectomy. (*Id.*)   Although he noted that Claimant had a history of two negative stress tests, Dr. Gharib recommended a cardiac catheterization due to Claimant's risk factors.  (*Id.*)

On March 14, 2001, Claimant was evaluated by Dr. Manual Franco, apparently at the request of West Virginia's Disability Determination Division.  (Tr. at 139-142).   Dr. Franco confirmed that Claimant was experiencing a recurrence of carpal tunnel

syndrome and agreed with a recent recommendation by Dr. Goebel that Claimant not return to work at that time. (*Id.*)   It does not appear that Claimant returned to work after this evaluation.

In December 2002, Dr. Goebel documented that Claimant was being followed for hypertension, diabetes, hyperlipidemia, carpal tunnel syndrome with chronic back pain, and headaches.   (Tr. at 183).   Dr. Goebel addressed medication management with Claimant related to these chronic conditions.

### B.   Medical Evidence After Alleged Onset of Disability

On March 3, 2003, two days after the alleged onset of disability, Claimant presented to Dr. Goebel's office for follow-up care.   She complained of "increasing anxiety attacks where she gets the chest pressure and shortness of breath.   She said it started when she was denied her disability."   (Tr. at 179). She also complained of tailbone pain and carpal tunnel symptoms.   She told Dr. Goebel that she had hallucinated in the middle of the night a couple of times and thought her hallucinations were related to Skelaxin, a medication she took for muscular pain. (*Id.*)  Dr. Goebel decided to withhold Skelaxin in view of the hallucinations. *(Id.)* She prescribed Lexapro for anxiety and depression in place of Zoloft, an antidepressant that Claimant used in the past.

Claimant saw Dr. Goebel again on July 1, 2003, complaining of some chest pain and shoulder soreness, which Claimant attributed to a recent motor vehicle accident. (Tr. at 175).   Dr. Goebel assessed Claimant with shoulder pain that was not severe; migraine headaches and chronic back pain; diabetes; hyperlipidemia; well-controlled hypertension; coronary disease that was asymptomatic in the absence of exertion; a skin rash; and anxiety and depression that was stable on Lexapro.   (*Id.).*  At the conclusion of

this visit, Dr. Goebel completed a residual functional capacity (RFC) evaluation in which she stated Claimant's diagnoses to be carpal tunnel; arthritis with back pain; coronary artery disease; diabetes mellitus; and hypertension.  (Tr. at 176).  Dr. Goebel's overall assessment was that Claimant was significantly limited in exertional, postural and manipulative capacities.

Claimant returned to Dr. Goebel in September 2003, complaining of daily substernal chest pain, which was not relieved with nitroglycerin, and painful swallowing. (Tr. at 174). On this visit, her hypertension was "out of control," because Claimant had not been taking her medication.  Dr. Goebel noted that in regard to Claimant's "Fibromyalgia/chronic fatigue/depression," Claimant "seems to have a lot of complaints today and muscle aches seem to be part of that."  (*Id.)* Dr. Goebel decided to see Claimant in one month.

On September 30, 2003, James Capage, Ph.D., completed a psychiatric review technique form for the SSA. (Tr. at 207-220).  He found that Claimant had a non-specific 12.04 impairment of anxiety and depression, which he rated as "not severe." From a functional standpoint, he felt that Claimant's restriction of activities of daily living was mild; her difficulties in maintaining social functioning was mild; her difficulties in maintaining concentration, persistence or pace was mild; and she had no limitation related to episodes of decompensation.   (Tr. at 217).  Mr. Capage referenced the note from Claimant's July 2003 office visit with Dr. Goebel and documented that Claimant was doing well on Lexapro.  He added that she is "forgetful" and has "trouble concentrating."  (Tr. at 219).

On October 1, 2003, Claimant was evaluated at the request of the West Virginia Disability Determination Division by Dr. Stephen Nutter, an occupational medicine

specialist. Dr. Nutter's examination was identified as an "Internal Medicine Evaluation" and did not include a psychological evaluation. (Tr. at 159-165). After an extensive physical assessment, his impression was:

- Carpal tunnel syndrome
- Arthralgia [joint pain]
- Chronic back pain, chronic lumbosacral strain without evidence of radiculopathy
- Shortness of breath, history of asthma and chronic bronchitis
- Chest pain
- Heachaches

(*Id.*)

On October 16, 2003, Dr. Fulvio Franyutti completed a physical residual functional capacity assessment with results that substantially differed from the results of Dr. Goebel's July evaluation. (Tr. at 199-206). Under the section regarding reliance on treating or examining source statements, Dr. Franyutti indicated that no treating or examining source statement regarding Claimant's physical capacities was in the file that he reviewed. He added that instead of a treating or examining source statement, he considered the "ALJ decision" and agreed with that decision.[4] He felt the RFC was also consistent with the Claimant's limited function of her hands, gross and fine manipulation. (Tr. at 205).

In 2004, the record contains four clinic notes prepared by Dr. Goebel. (Tr. at 249-258). The first note describes a visit on March 23, 2004, in which Claimant's primary complaint was an increase in anginal chest pain. She described other pain symptoms in her neck, back and leg, which had come and gone, none of which appeared severe on the day of the visit. (Tr. at 258). In June, Claimant reported to Dr. Goebel

---

[4] The Court presumes this is the decision in 2003 by ALJ Barry Anderson. There is no explanation for why Dr. Goebel's July 2003 RFC was not provided to Dr. Franyutti.

that she was in the middle of a two–part stress test ordered by a local cardiologist and she needed medication refills.  Otherwise, the visit was routine. (Tr. at 257).

On July 8, 2004, Dr. Elie Gharib prepared his assessment of Claimant's coronary status post stress testing.  (Tr. at 300).  Dr. Gharib diagnosed chest pain syndrome; coronary artery disease; diabetes mellitus; obesity; gastroesophageal reflux disease; and hyperlipidemia.  (*Id.*).  Claimant reported to him that her chest-pain symptoms had improved and she could swim without significant angina; however, "when she becomes upset and with arm exercises, she does have chest pain."  (*Id.*).  Dr. Gharib recommended a left heart catheterization, but Claimant chose to continue medical management instead. (*Id.*).

On September 21, 2004, Claimant returned to Dr. Goebel for follow-up.  At this time, Dr. Goebel noted that most of her chronic conditions were stable.  Dr. Goebel indicated that Claimant's coronary disease also was fairly stable, and Claimant felt that her chest pains "may be more from her panic than the heart."  Dr. Goebel added in an addendum that Claimant's fibromyalgia appeared to be doing well and her carpal tunnel was stable as long as she was off work and not doing much activity with her hands.  (Tr. at 256).

The final dictated office record from Dr. Goebel is dated December 21, 2004.  On this office visit, Claimant's blood pressure was 180/100, secondary to noncompliance.  She reported leg pains associated with prior cholesterol medications; carpal tunnel, which was not a big problem; and headaches that had improved since she stopped working.  (Tr. at 249).

On September 20, 2005, Dr. Goebel wrote a letter indicating that Claimant continued to have back pain and pain associated with carpal tunnel syndrome, as well as

diabetes, hypertension, heart disease, and skin rashes.  (Tr. at 298).  Dr. Goebel felt that

Claimant was unable to return to her sedentary job and likely would not be able to hold

down any gainful employment.  (*Id.*).  In January 2006, Dr. Goebel submitted an

updated residual physical functional capacity evaluation in which she concluded that

Claimant was substantially limited in exertional, postural and manipulative functions.

(Tr. at 299).

## V.    Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the final decision of the Commissioner was not supported

by substantial evidence.  She points to the following four specific errors by the ALJ, any

one of which Claimant believes would justify a reversal and/or remand of the final

decision:

1.  That the ALJ improperly assessed her credibility.

2.  The ALJ failed to develop the medical evidence regarding chronic pain.

3.  The ALJ failed to properly consider and evaluate the Claimant's disability under
    the combination of impairments listing; and

4.  The ALJ wrongfully rejected the opinions of Dr. Goebel, Claimant's primary care
    physician.

(Pl. Br. at 13).

To the contrary, the Commissioner argues that substantial evidence supported

the ALJ's finding "at each step of the sequential evaluation process." (Def. Br. at 5).  He

contends that the ALJ properly assessed Claimant's credibility, because the objective

medical evidence did not support the severity and intensity of pain alleged by Claimant.

(Def. Br. at 12).  He also posits that the ALJ fully evaluated Claimant's impairments,

separately and in combination, as is evidenced by the ALJ's comprehensive analysis of

the various medical conditions suffered by Claimant and their impact on her overall function.  (Def. Br. at 6-8). The Commissioner further contends that the ALJ fully discharged his duty to develop the record regarding chronic pain, because the medical documentation presented at the hearing was replete with descriptions regarding Claimant's pain.  (Def. Br. at 8-9).  Likewise, the Commissioner asserts that the ALJ was well within his discretion to reject Dr. Goebel's opinions and adopt those of the agency physician and non-examining reviewer, because Dr. Goebel's evaluation of the extent of Claimant's limitations was inconsistent with substantial objective evidence, including her own office records.  (Def. Br. at 10).

## VI.    Discussion

Having carefully considered the decision of the ALJ and the evidence of record, the Court has no choice but to conclude that the ALJ did not have substantial evidence to support his findings.  In particular, the ALJ failed to document that he used the "special technique" required to evaluate the mental impairment alleged by Claimant.  20 C.F.R. §§404.1520a; See also, *Hardy v. Astrue,* 2010 WL 3341584 (N.D.W.Va.)

Undisputedly, Claimant asserted a mental impairment related to anxiety and depression. Accordingly, the ALJ was required to evaluate Claimant's mental impairment using the special technique outlined in 20 C.F.R. § 404.1520a.  This technique is expressly designed to (1) identify the need for additional evidence to determine impairment severity; (2) consider and evaluate functional consequences of the mental disorder relevant to the Claimant's ability to work; and (3) organize and present the findings in a clear and concise manner. 20 C.F.R. § 404.1520a(a).  Integral to completion of the special technique is proper documentation of the process.  20 C.F.R. § 404-1520a(e) requires the ALJ to prepare a decision that:

. . .incorporates the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  **The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.**" (emphasis added).

The first step of the special technique required the ALJ to evaluate the pertinent symptoms, signs and laboratory findings to assess whether a medically determinable mental impairment existed.   20 C.F.R. § 404.1520a.  In this case, both Dr. Goebel and the non-examining psychiatric reviewer retained by the SSA documented that Claimant had a medically determinable 12.04 mental impairment related to anxiety and depression.  (Tr. at 210, 277).  While the ALJ implicitly acknowledged the existence of this impairment by commenting on it in his discussion of the Claimant's severe and non-severe impairments, he did not document his assessment of Claimant's "symptoms, signs and laboratory findings" supportive of medical determinability. (Tr. at 19). Moreover, if he concluded that there was no medically determinable mental impairment, he failed to document that conclusion and its basis.  Instead, the ALJ simply noted on multiple occasions that the Claimant did not undergo "psychiatric or psychological treatment."  (Tr. at 19, 20, 21).  This statement, however, is incorrect. Claimant testified that Dr. Goebel provided treatment for her anxiety and depression by prescribing Lexapro, a fact that is confirmed by the medical records.[5]  In addition, Claimant explained that Dr. Goebel had decided to withhold a referral to a psychiatric specialist "until she decided she couldn't handle it."  (Tr. at 316).  Based upon this testimony and the medical records, the Court concludes that the evidence substantiates

---

[5]  Lexapro is prescribed to treat major depressive disorder and generalized anxiety disorder in adults. See www.lexapro.com, Forest Laboratories Inc. 2010.

the existence of a medically determinable mental impairment of anxiety and depression.[6]

The next step of the special technique required the ALJ to rate the degree of functional limitation resulting from the mental impairment as follows:

c) *Rating the degree of functional limitation.*

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

20 C.F.R. § 404.1520a(c).

---

[6]  The record is unclear as to why Mr. Capage did not complete Section 12.06 of the Psychiatric Review Technique related to Anxiety-related Disorders.

This evaluation similarly was not performed, or if it was performed, it was not documented as mandated by 20 C.F.R. § 404-1520a(e).

Instead of applying the steps of the special technique, the ALJ simply discounted Claimant's mental impairment stating, "[d]espite the claimant's allegations of depression and anxiety (with the latter occurring when she experiences chest pain), she takes only Lexapro (prescribed by Dr. Goebel) and does not undergo any psychiatric or psychological treatment nor does the record reflect any referrals for evaluation for her alleged psychiatric symptoms."  (Tr. at 19).  The ALJ failed to take into account, however, significant notations contained in the medical records, the application, and the testimony of the Claimant.  The medical records reflect that Claimant suffered from depression for many years and had been prescribed a variety of medications including Paxil, Zoloft, and Elavil before switching to Lexapro. (Tr. at 277).  She had documented episodes of anxiety attacks that resulted in chest pressure and shortness of breath.[7] (Tr. at 179). At the hearing, Claimant related that she continued to suffer from anxiety and depression, which were being treated by Dr. Goebel, and that she occasionally experienced what could be described as hallucinations.  (Tr. at 315-316).   In her application, she portrayed herself as irritable, forgetful, and unable to concentrate.  (Tr. at 117).   She claimed that her social activities had decreased, that she no longer participated in her hobbies due to pain, and that she had trouble completing tasks. (Tr. at 116-117).  She told her cardiologist, Dr. Gharib, that she experienced chest pain when she "becomes upset," and she reported to Dr. Goebel that "she has chest pains that she

---

[7]  The ALJ suggested that Claimant suffered anxiety attacks as a result of or concurrent with coronary symptoms. (Tr. at 19, 20).  However, the Court interprets the records to indicate that Claimant's anxiety attacks lead to chest pain and shortness of breath.  This interpretation is further supported by the September 21, 2004 office record of Dr. Goebel in which she notes that Claimant believed her chest pain was actually from panic attacks rather than coronary artery disease.  (Tr. at 256).

thinks may be more from her panic than the heart." (Tr. at 256, 300).  Despite these references, and his acknowledgement that Claimant had never undergone comprehensive psychological testing or evaluation, the ALJ concluded that Claimant's mental impairment did not result in any functional limitations and, therefore, was not a severe impairment.  (Tr. at 19).   The Court suggests that instead of using the lack of formal testing to discount Claimant's mental impairment, the ALJ should have considered the need "for additional evidence to determine impairment severity."  20 C.F.R. § 404.1520a(a)(1).  At that point, the ALJ should have analyzed the need to return the case to the State agency or the appropriate Federal component to complete a necessary psychological assessment, which would have provided a sound basis for determining the functional limitations, and, thus, the severity of the impairment.  20 C.F.R. § 404-1520a(e)(3).  Having failed to fully evaluate and clearly document the functional limitations that might flow from Claimant's mental impairment, the ALJ was hard-pressed to accurately rate the degree of severity of that impairment.  Accordingly, this defect of process irreversibly tainted the remainder of the ALJ's sequential evaluation, including his determination as to whether Claimant's impairments, in combination, met or equaled a listed impairment.

The undersigned notes that a psychiatric review was completed by a non-examining agency expert, who concluded that Claimant's mental impairment of anxiety/depression was non-severe and only minimally affected her ability to function; however, this evaluation appears to be based primarily on one note by Dr. Goebel that Claimant was "doing well on Lexapro."  (Tr. at 207-219).  Otherwise, the evaluation is essentially devoid of any clues as to what evidence the reviewer considered in reaching his conclusions.  Although the reviewer may be correct that Claimant's depression and

anxiety result in only mild functional limitations, the Court is unable to find substantial evidence in this record upon which to support the conclusion of the ALJ.   In his decision, the ALJ should have "refer[ed] specifically to the evidence informing his conclusion.  The duty of explanation is always an important aspect of the administrative charge. . ." *Hammond v. Heckler,* 765 F.2d 424, 426 (4th Cir. 1985).

The absence of substantial evidence relating to the limitations and severity of Claimant's mental impairment is also significant in light of the ALJ's finding that Claimant had transferable skills.  The ALJ acknowledged that Claimant was defined as a person of advanced age under 20 C.F.R. § 404.1563 and found that she had a functional capacity for light work with some exertional and nonexertional limitations.  (Tr. at 19, 23). 20 C.F.R. § 404.1563(e) states as follows:

> We consider that at advanced age (age 55 or older), age significantly affects a person's ability to adjust to other work.  We have special rules for persons of advanced age and for persons in this category who are closely approaching retirement age (age 60 or older).  See § 404.1568(d)(4).

20 C.F.R. § 404.1568(d)(4) provides:

> If you are of advanced age (age 55 or older), and you have a severe impairment(s) that limits you to sedentary or light work, we will find that you cannot make an adjustment to other work unless you have skills that you can transfer to other skilled or semiskilled work. . . .that you can do despite your impairment(s).

The ALJ asked the vocational expert if Claimant had any transferable skills, and the expert stated, "Well just to other types of customer service type work, Your Honor."  (Tr. at 327).   Relying upon this testimony, the ALJ found that Claimant had "customer service" skills that were transferable and, based upon that finding, Claimant was deemed not disabled under the Social Security Act. (Tr. at 23).

Arguably, a thorough evaluation of the functional limitations associated with Claimant's mental impairment—particularly in the areas of social functioning, concentration, persistence, pace, and episodes of decompensation—potentially could have changed the vocational expert's opinion on the transferability of Claimant's "customer service" skills.   Customer service representatives must have good interpersonal, communication, and problem-solving skills, which may require high levels of social functioning, concentration and persistence.   According to the United States Department of Labor, customer service representatives must be able to "deal patiently with problems and complaints and to remain courteous when faced with difficult or angry people.   Also, a customer service representative often must be able to work independently within specified time constraints."[8]   Certainly, an evaluation of the limitations associated with Claimant's depression and anxiety would have shed light on Claimant's ability to adjust to the jobs identified by the vocational expert.

At step five of the sequential evaluation, defendant had the burden of proving that specific jobs existed in significant numbers in the national economy, which Claimant could perform even in view of her age, education, work experience, skills, and physical/mental shortcomings.   *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).   The difficulty of sustaining this burden in the absence of a valid assessment of Claimant's mental shortcomings was apparent in the transcript.   In response to a hypothetical question from the ALJ, the vocational expert opined that Claimant could adjust to jobs available in the nation and region if her "pain, anxiety and depression" were "mild to moderate." (Tr. at 328).   He further stated that if Claimant's pain, anxiety,

---

[8]   U.S. Department of Labor, Bureau of Labor Statistics, Occupational Outlook Handbook, 2101-2011 Edition.

and depression were severe, however, there would be no jobs in the national economy that Claimant could perform.  (Tr. at 328).   When asked by Claimant's counsel on cross-examination to provide an opinion on the subject of job availability assuming Claimant had a "moderate" impairment related to pain, anxiety and depression, the vocational expert could not render an opinion, because he was uncertain about the definition of the term "moderate."   (Tr. at 330).   Clearly, an appropriate evaluation of Claimant's functional limitations and the resulting severity of her mental impairment would have yielded a more precise and valid opinion in this case.

Accordingly, the undersigned respectfully proposes that the District Court **FIND** (1) that the ALJ failed to comply with 20 C.F.R. § 404.1520a, and (2) that this failure mandates a further finding that the final decision of the Commissioner was not supported by substantial evidence.[9]   Finally, the undersigned proposes that the Court **FIND** that this matter should be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## VII.   Recommendations for Disposition

Based on the foregoing, the undersigned Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** plaintiff's Motion for Judgment on the Pleadings (Docket No. 14), **DENY** defendant's Motion for Judgment on the Pleadings (Docket No. 15), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings, and **DISMISS** this action from the docket of the Court.

---

[9]  Because the decision of the Commissioner requires remand on this ground alone, the Court has not addressed the other arguments of the parties.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure. The defendant shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** November 22, 2010.

Cheryl A. Eifert
United States Magistrate Judge